FILED

2024 Sep-27  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MICHAEL A. MINTON,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:22-cv-00944-MHH** |
| | } | |
| | } | |
| **MARTIN O'MALLEY,** | } | |
| **Commissioner of the Social Security** | } | |
| **Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Michael Minton has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner of Social Security denied Mr. Minton's claims for a period of disability and disability insurance benefits based on an ALJ's decision finding that Mr. Minton was not disabled.  The Appeals Council declined to review the ALJ's decision.  Mr. Minton contends that the Appeals

---

[1] On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time.").

Council erred in doing so because he submitted additional evidence to the Appeals Council that he asserts was new, material, and chronologically relevant, requiring Appeals Council review.  To evaluate Mr. Minton's argument, the Court first must consider the evidence that Mr. Minton presented to the ALJ.

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Minton had to prove that he was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months."  42 U.S.C. § 423(d)(1)(A)).[2]  A claimant must prove that he is disabled.  *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

─────────────────────────

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same."  *Disability Evaluation Under Social Security*, Soc. Sec. Admin., https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Sept. 25, 2024).

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin*, 631 F.3d 116, 1178 (11th Cir. 2011).  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."  *Wright*, 327 Fed. Appx. at 137.

Mr. Minton applied for disability benefits on December 19, 2018.  (Doc. 5-8, p. 5).  He alleged his disability began on August 24, 2018.  (Doc. 5-8, p. 5).  The Commissioner initially denied Mr. Minton's claims on April 29, 2019.  (Doc. 5-5, p. 3).  Mr. Minton requested a hearing before an Administrative Law Judge.  (Doc. 5-6, p. 9).  Mr. Minton could not attend a hearing on February 4, 2020 because he had the flu.  (Doc. 5-4, p. 26).  Mr. Minton's attorney attended the hearing and objected to the ALJ continuing the hearing without Mr. Minton.  (Doc. 5-4, pp. 30-32).  Despite the objection, the ALJ proceeded with the February 4, 2020 hearing.

(Doc. 5-4, p. 32).  A vocational expert testified at the hearing.  (Doc. 5-4, pp. 32-39).  Mr. Minton and his attorney attended a supplemental hearing on September 2, 2021.  Mr. Minton testified at the 2021 hearing.  (Doc. 5-4, pp. 2-17).  A different vocational expert testified at the 2021 hearing.  (Doc. 5-4, pp. 17-23).

The ALJ issued an unfavorable decision on September 20, 2021.  (Doc. 5-3, pp. 119-144).  Mr. Minton asked the Appeals Council to review the ALJ's decision and submitted additional evidence for the Appeals Council to consider.  (Doc. 5-3, pp. 2-5).  On May 27, 2022, the Appeals Council found that the additional evidence was not new, material, and chronologically relevant.  (Doc. 5-3, p. 3).  The Appeals Council declined Mr. Minton's request for review, (Doc. 5-3, pp. 2-3), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Minton's Medical Records*

Mr. Minton is a disabled veteran who served in the Army from April 1990 until August 2016 when he retired.  (Doc. 5-14, p. 92).  To support his application, Mr. Minton submitted medical records from the Veterans Administration and private medical providers relating to the treatment and diagnoses of depression, bipolar II disorder, post-traumatic stress disorder, generalized anxiety disorder, ischemic heart disease, coronary artery disease, hypertension, obesity, sleep apnea, asthma, and

4

osteoarthritis. (*See* Docs. 5-10, 5-11, 5-12, 5-13, 5-14, 5-15, and 5-16). The Court has reviewed the medical records that appear in the administrative record and summarizes the following medical records because they are most relevant to the Court's decision in this appeal.[3]

On October 4, 2011, Mr. Minton saw Dr. Benjamin Carr at Carr Mental Wellness. (Doc. 5-4, p. 62). Mr. Minton reported that he worked for the National Guard, had "trouble with anger" about his wife's past affair, and took out his anger on his children. (Doc. 5-4, p. 62). Dr. Carr noted that Mr. Minton had used Pristiq, Cymbalta, and Effexor in the past for his depression and anxiety "with only partial response." (Doc. 5-4, pp. 62, 63). Dr. Carr described Mr. Minton as "friendly, attentive, fully communicative, but tense." (Doc. 5-4, p. 63). Dr. Carr noted that Mr. Minton had moderate depression and anxiety but no signs of psychosis. (Doc. 5-4, p. 63). Dr. Carr diagnosed Mr. Minton with generalized anxiety disorder, prescribed Lamictal, and continued Mr. Minton on Pristiq with plans to taper off that medication at the next visit. (Doc. 5-4, p. 63).[4]

---

[3] Mr. Minton notes in his brief that his physical impairments are limiting, but the "focus of this appeal is on the treatment of [Mr.] Minton's mental impairments by the ALJ and Appeals Council." (Doc. 7, p. 4). The Court discusses only Mr. Minton's mental impairments.

[4] Lamictal, the brand name for lamotrigine, can be used to treat "bipolar disorder (manic-depression illness) in adults." *See Lamotrigine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/side-effects/drg-20067449?p=1 (last visited Sept. 25, 2024).

Mr. Minton returned to Dr. Carr on November 8, 2011 and reported that he felt "more even" on Lamictal, felt agitated before the medications took effect, and better handled conflict with his wife.  (Doc. 5-4, p. 65).  Dr. Carr noted that Mr. Minton showed no signs of depression, cognitive difficulty, anxiety, or hyperactivity; had intact memory, judgment, and insight; and had normal attention span and speech; or "no serious mental status abnormalities."  (Doc. 5-4, p. 65).  Dr. Carr increased Mr. Minton's Lamictal prescription to 200 mg once daily and began tapering Pristiq.  (Doc. 5-4, p. 66).

On September 4, 2014, Mr. Minton saw Dr. Carr and complained of anxiety. (Doc. 5-10, pp. 29, 30).[5]  Mr. Minton reported that his anxiety symptoms were "about the same," that stress made his symptoms worse, and that medications were "somewhat helpful."  (Doc. 5-10, p. 29).  Dr. Carr noted that Mr. Minton had an euthymic mood and affect, linear and goal-directed thoughts, grossly intact cognition, average fund of knowledge, good insight and judgment, no psychosis, and no suicidal ideations.  (Doc. 5-10, pp. 29-30).  Dr. Carr changed the Lamictal prescription to 100 mg twice a day.  (Doc. 5-10, p. 30).  Mr. Minton returned to Dr. Carr on July 29, 2015 and reported he felt good and that stress made his symptoms worse.  (Doc. 5-10, p. 26).  Dr. Carr noted mental status examination results for Mr.

---

[5] The administrative record does not contain records for visits with Dr. Carr from 2012 to September 2014.

Minton like those from the September 4 visit.  (Doc. 5-10, pp. 26-27).  Dr. Carr changed the Lamictal prescription to 200 mg daily.  (Doc. 5-10, p. 27).

Mr. Minton saw Dr. Carr on four occasions between April 2016 to May 2017. (Doc. 5-10, pp. 13-15, 16-18, 19-21, 23-25).  At each visit, Dr. Carr noted that Mr. Minton's mental status examination was normal.  (Doc. 5-10, pp. 14, 17, 19-20, 24). At an April 28, 2016 visit, Mr. Minton was doing well and stated he would retire later that year.  (Doc. 5-10, p. 23).  Dr. Carr's diagnoses included chronic post-traumatic stress disorder and sleep apnea.  (Doc. 5-10, p. 24).  At an August 3, 2016 visit, Mr. Minton reported that he "enjoyed retirement" and did a lot of woodworking.  (Doc. 5-10, p. 19).  Mr. Minton complained at an April 19, 2017 visit that he could not "concentrate on anything," had "a lot of trouble focusing," and was frustrated because he had "trouble completing tasks."  (Doc. 5-10, p. 16).  Dr. Carr's diagnosis included anxiety disorder.  (Doc. 5-10, p. 17).  Dr. Carr continued Mr. Minton on 200 mg of Lamictal and added a prescription for Ritalin.  (Doc. 5-10, pp. 16, 18).  On May 17, 2017, Mr. Minton reported that he felt "better since starting Ritalin" and that he could focus on tasks.  (Doc. 5-10, p. 13).

VA medical records indicate that Mr. Minton has a 90% service-related disability, which included a 30% disability for post-traumatic stress disorder.  (Doc.

5-12, p. 18).[6]  On March 22, 2018, Mr. Minton saw Dr. Rey Gavino at the Rainbow City VA medical clinic.  (Doc. 5-10, pp. 17-185).  Mr. Minton's PTSD screening at this visit was "negative."  (Doc. 5-10, pp. 180-81).  Mr. Minton reported that, in the prior month, he did not have nightmares; was not constantly on guard, watchful, or easily startled; and did not feel numb or detached from others.  (Doc. 5-10, pp. 180-81).  Dr. Gavino noted that Mr. Minton reported no suicidal thoughts and had "[n]o [m]ental [h]ealth condition requiring further intervention."  (Doc. 5-10, p. 185).

Mr. Minton saw CRNP Marilyn McAnalley at the Rainbow City VA medical clinic on September 13, 2018 for a sinus infection.  (Doc. 5-10, pp. 157-63).  CRNP McAnalley noted that Mr. Minton's mood, affect, and neurological and psychological systems were normal and grossly intact.  (Doc. 5-10, pp. 159-60).  At a return visit to the VA medical clinic on March 21, 2019, Mr. Minton reported to LPN Julie Maddox that he did not have emotional or psychological "factors."  (Doc. 5-11, pp. 5-7).  Mr. Minton reported feeling "down, depressed, or hopeless" and feeling "[l]ittle interest in doing things" several days over the preceding two weeks.

---

[6]  The Court cannot find documents in Mr. Minton's administrative record to explain Mr. Minton's 30% PTSD disability rating.  Mr. Minton submitted to the Appeals Council an April 4, 2002 letter from the VA that indicated that as of December 14, 2021, Mr. Minton had combined service-connected disabilities rated at 100%, but the letter did not mention Mr. Minton's PTSD.  (Doc. 5-3, p. 62).  The ALJ acknowledged Mr. Minton's VA's 30% disability rating for PTSD and considered it but noted that the record contained "no DD-214 long [f]orm regarding [Mr. Minton's] discharge from military service" and that Mr. Minton "testified that he had flashbacks at his last job regarding childhood abuse, but that [was] not shown in the evidence to be the 30% SCD." (Doc. 5-3, p. 134).

(Doc. 5-11, p. 15).  Mr. Minton reported no suicidal thoughts.  (Doc. 5-11, p. 14). Dr. Gavino noted that Dr. Carr had prescribed medications for Mr. Minton's depression and anxiety, but Mr. Minton did not "see Dr. Carr anymore."  (Doc. 5-11, p. 16).  Mr. Minton indicated that he wanted to see someone at the VA mental health clinic for his "anger issues."  (Doc. 5-11, p. 16).

On April 2, 2019, Mr. Minton saw CRNP Jennifer Wilson at the Gadsden VA mental health clinic because his anxiety and depression were worse.  (Doc. 5-11, p. 208).  Mr. Minton reported anger issues, irritability, "pervasive sadness," decreased energy and concentration, "hyper startle response," and "hyper vigilance."  (Doc. 5-11, pp. 215-16).  Mr. Minton denied having panic attacks or suicidal ideation.  (Doc. 5-11, p. 216).  Mr. Minton had a neat and clean appearance; dysthymic and anxious mood; congruent affect; logical thought process and content; and intact judgment, insight, concentration, and memory.  (Doc. 5-11, p. 218).  CRNP Wilson continued Mr. Minton on 200 mg Lamictal daily, prescribed Lexapro for depression and anxiety, and recommended therapy to address stress and problem solving.  (Doc. 5-11, p. 217).

At a May14, 2019 visit with CRNP Wilson, Mr. Minton reported that he was "doing well" and that his depression and anxiety symptoms had "improved."  (Doc. 5-11, p. 197).  Mr. Minton indicated that he felt "more even" after starting Lexapro, did not have "prolonged depression or mood swings," and slept better.  (Doc. 5-11,

p. 197). CRNP Wilson noted that Mr. Minton was clean and neat, and his mental status examination was normal. (Doc. 5-11, p. 200). On August 9, 2019, Mr. Minton reported that Lexapro worked well and that he did not have anger, prolonged depression, or mood swings. (Doc. 5-11, pp. 177-78). CRNP Wilson noted that Mr. Minton declined individual therapy. (Doc. 5-11, p. 177). At a visit with CRNP Wilson on January 28 2020, Mr. Minton was clean and neat and denied prolonged depression or mood swings. (Doc. 5-15, pp. 31, 32, 34).

On March 6, 2020, CRNP Wilson recommended that Mr. Minton taper off Lexapro and start Cymbalta because Mr. Minton had a "painful right jaw joint" and clenched his teeth possibly because of his use of Lexapro. (Doc. 5-12, pp. 92-93). Mr. Minton reported to LPN Maddox on March 12, 2020 that he felt little interest or pleasure in doing things several days a week, but he did not feel down or depressed. (Doc. 5-12, pp. 84-85). Mr. Minton scored a one on the PHQ-2 depression screening, "which indicate[d] a negative screen" for depression over the prior two weeks. (Doc. 5-12, p. 84).

At an April 28, 2020 visit with CRNP Wilson, Mr. Minton indicated that he felt "ok most of the time;" that the Lamictal effectively stabilized his mood; that he did not have prolonged depression, mood swings, or suicidal ideations; and that he continued to taper Lexapro and began Cymbalta. (Doc. 5-12, pp. 69, 75). Mr. Minton stated that a "non-VA provider" prescribed valium, and Mr. Minton's jaw

clenching ceased.  (Doc. 5-12, p. 69).  Mr. Minton told the CRNP Wilson that a past provider diagnosed him with bipolar II disorder.  (Doc. 5-12, p. 69).  CRNP Wilson's diagnoses included PTSD, depression, and bipolar II disorder.  (Doc. 5-12, p. 69).

Mr. Minton emailed CRNP Wilson on May 22, 2020 and stated that he was "super irritable," would "snap on people for the last little thing," and could "hardly complete a task . . . without getting sidetracked."  (Doc. 5-12, p. 66).  Mr. Minton indicated that "Lexapro was much better."  (Doc. 5-12, p. 66).  CRNP Wilson noted on May 27, 2020 that Mr. Minton could discontinue taking Cymbalta and restart Lexapro.  (Doc. 5-12, p. 66).

On June 23, 2020, Mr. Minton called the Gadsden VA mental health clinic and requested a neurology consult for memory issues that worried him.  (Doc. 5-12, p. 15).  Mr. Minton reported that he could not find his wallet or keys, that he sometimes forgot where he was going when he drove, and that his memory issues were worse and more frequent.  (Doc. 5-12, p. 15).  On July 10, 2020, the VA clinic could not get in contact with Mr. Minton to schedule a neurology appointment. (Doc. 5-12, p. 17).  On July 27, 2020, the VA clinic stopped trying to schedule a neurology consult because Mr. Minton "did not respond to mandated scheduling effort[s]."  (Doc. 5-12, p. 17).

Because of the COVID-19 pandemic, on August 19, 2020, Mr. Minton had a telephone appointment with psychiatrist Dr. Ellen Amrock at the VA mental health

clinic.  (Doc. 5-12, pp. 57-61).   Mr. Minton reported that he had "days of depression," was easily distracted, could not complete things, "could not get through a to-do list," was inattentive, and forgot where he was going.  (Doc. 5-12, p. 58). Mr. Minton stated that Lexapro and Lamictal were "helpful medications for controlling his mood fluctuations."  (Doc. 5-12, p. 58).   Mr. Minton had normal speech, euthymic mood and affect, normal thoughts, no suicidal ideation, intact judgment and insight, and grossly intact remote and recent memory.  (Doc. 5-12, p. 58).  Dr. Amrock's diagnosis included chronic PTSD.  (Doc. 5-12, p. 59).   Dr. Amrock increased Mr. Minton's Lexapro dosage to 20 mg because reducing the Lexapro dosage did not alleviate his jaw pain.  (Doc. 5-12, pp. 58-59).  Dr. Amrock noted that she might add Wellbutrin in the future.  (Doc. 5-12, pp. 58-59).  During a November 17, 2020 telephone appointment with Dr. Amrock, Mr. Minton reported that he had less frequent anger outbursts since increasing the Lexapro dosage; that he felt drained and did not get out of bed two days per week; and that he had had these problems "for a long time."  (Doc. 5-12, pp. 53-54).

On February 12, 2021, Mr. Minton emailed Dr. Amrock and reported issues with "short term memory loss."  (Doc. 5-12, p. 51).  At a telephone appointment with Dr. Amrock on February 22, 2021, Mr. Minton reported that he was "doing better" after "a two-week funk."  (Doc. 5-12, pp. 45-46).  Mr. Minton stated that he woke up in the morning and went right back to bed because he was not motivated to

do anything, he "did not care about a thing in the world," and he had concentration and memory difficulties. (Doc. 5-12, p. 46). He denied PTSD symptoms and suicidal ideations. (Doc. 5-12, p. 46). Dr. Amrock continued Mr. Minton on Lexapro and Lamictal, discussed a potential referral to a memory clinic, recommended a video session for the next visit, and referred Mr. Minton to peer support. (Doc. 5-12, p. 48).

On March 10, 2021, Mr. Minton had a session with Steve Johnson, a therapist at the Gadsden VA mental health clinic. (Doc. 5-12, p. 38). Mr. Minton reported that he had "bad symptoms," had "bad memory loss," got disoriented when driving, had "sudden onset of anger out of nowhere," could not finish projects, and hoarded. (Doc. 5-12, p. 39). Mr. Minton denied suicidal ideation. (Doc. 5-12, p. 39). Mr. Minton indicated that he had "ineffective coping" skills and discussed with Mr. Johnson "coping skills regarding stress and anxiety." (Doc. 5-12, p. 39). On March 22, 2021, LPN Maddox at the Gadsden VA clinic noted that Mr. Minton had a negative PHQ-2 screening for depression; Mr. Minton denied having "[l]ittle interest or pleasure in doing things" and "[f]eeling down, depressed, or hopeless." (Doc. 5-12, pp. 31-32). At an April 26, 2021 video telehealth appointment with Dr. Amrock, Mr. Minton reported that he felt down and had low energy, mood, and motivation two to three times a week, but he denied suicidal ideations. (Doc 5-14, pp. 99, 103). Mr. Minton stated that he had trouble finishing tasks, overate, and had anger

outbursts every three to four weeks.  (Doc. 5-14, p. 99).  Dr. Amrock prescribed Wellbutrin for "mood augmentation" and continued Lexapro and Lamictal.  (Doc. 5-14, p. 102).

Mr. Minton returned to Dr. Carr on June 21, 2021.  (Doc. 5-14, p. 52).  Mr. Minton reported that he received mental health treatment at the VA but did "not have good rapport with the psychiatrist."  (Doc. 5-14, p. 52).  Mr. Minton indicated that he "struggled with low energy and poor motivation" despite multiple medication adjustments.  (Doc. 5-14, p. 52).  Mr. Minton stated that his "mood and focus were much better" when he was treated for ADHD.  (Doc. 5-14, p. 52).  Dr. Carr noted that Mr. Minton was pleasant and cooperative and had normal speech, an euthymic mood, full affect, linear and goal-directed thoughts, no psychosis, grossly intact cognition, good insight and judgment, and no suicidal thoughts.  (Doc. 5-14, p. 52). Dr. Carr's diagnoses included chronic PTSD and "[a]ttention-deficit disorder, combined type."  (Doc. 5-14, p. 53).  Dr. Carr prescribed Ritalin because Mr. Minton "was doing much better on it."  (Doc. 5-14, p. 53).

On June 23, 2021, Mr. Minton returned to Mr. Johnson at the Gadsden VA mental health clinic for therapy.  (Doc. 5-14, p. 92).  Mr. Minton complained of "very low frustration tolerance," "poor sleep most nights," and "issues with anger." (Doc. 5-14, p. 93).  Mr. Johnson noted that Mr. Minton was appropriately dressed; oriented to time, place, person, and situation; and mildly anxious.  (Doc. 5-14, p.

92).   The therapy session focused on Mr. Minton's "current level of functional adjustment" and "positive coping skills aimed at reducing stress and anxiety." (Doc. 5-14, p. 93).

Mr. Minton had a clinical video telehealth appointment with Dr. Amrock on August 4, 2021 and reported that Dr. Carr had prescribed Ritalin, but Ritalin did not help and made him tired.  (Doc. 5-15, pp. 65, 70).  Mr. Minton stated that he had not received formal testing for ADHD and thought his symptoms might be "related to something else."  (Doc. 5-15, p. 65).  Mr. Minton indicated that Wellbutrin helped with stress tolerance, but he took it at night because it made him tired; that he did not "wake up angry as much" taking Wellbutrin; and that he still clenched his jaw and had "anger outbursts."  (Doc. 5-15, pp. 65-66).  Mr. Minton stated that he had hypomania with increased energy for a day but then had "several days per week of low mood [and] motivation." (Doc. 5-15, p. 66).  Dr. Amrock noted that Mr. Minton had a "down" mood and affect, normal speech, no psychosis, no suicidal ideations, and intact insight and judgment.  (Doc. 5-15, p. 68).  Dr. Amrock indicated that Mr. Minton's symptoms did not appear to be consistent with bipolar disorder and suggested a "more structured assessment to aid with diagnosis."  (Doc. 5-15, p. 68).  Dr. Amrock diagnosed chronic PTSD.  (Doc. 5-15, p. 68).  Dr. Amrock increased Mr. Minton's Wellbutrin dosage to 300 mg extended release "for mood

augmentation" and continued Mr. Minton on Lexapro and Lamictal. (Doc. 5-15, p. 68).

Mr. Minton returned to Dr. Carr on August 23, 2021 and stated that he felt "better since being on the Ritalin" but "still ha[d] residual depressive symptoms" daily. (Doc. 5-15, p. 20). Mr. Minton indicated that he was anxious about his disability hearing and that Lamictal was "partially helpful." (Doc. 5-5, p. 20). Dr. Carr noted that Mr. Minton was pleasant and cooperative and had normal psychomotor activity, a depressed mood and affect, linear and goal-oriented thought process, grossly intact cognition, good insight and judgment, no suicidal ideations, and a normal attention span. (Doc. 5-15, p. 21). Dr. Carr's diagnoses included chronic PTSD, bipolar disorder, and ADHD. (Doc. 5-15, pp. 21-22). Dr. Carr continued Mr. Minton on Ritalin and increased Lamictal for "residual depressive symptoms." (Doc. 5-15, p. 22).

Mr. Minton returned for therapy with Mr. Johnson on August 24, 2021 and reported that he had "been having a lot of bad thoughts about the past." (Doc. 5-15, pp. 62-63). Mr. Minton had a mildly anxious mood and affect. (Doc. 5-15, p. 62). Mr. Minton and Mr. Johnson discussed Mr. Minton's "concerns regarding issues from his past" and coping skills to reduce stress and anxiety. (Doc. 5-15, p. 63).

### *Mr. Minton's Function Report*

In February 2019, at the request of the Social Security Administration, Mr. Minton completed a function report. (Doc. 5-9, pp. 31-38). In his function report, Mr. Minton stated that from the time he woke up until he went to bed, he took care of his personal hygiene, took his medications, took his child to school, ate breakfast, read, rested, ate lunch, picked up his child from school, took his child to gymnastics, and prepared dinner. (Doc. 5-9, p. 31). Mr. Minton indicated that because of his medical conditions, he could not do manual labor and could "no longer concentrate long enough to complete lengthy tasks." (Doc. 5-9, p. 32).

Mr. Minton stated that he did not have a problem with his personal care, but his wife reminded him to bathe and brush his teeth. (Doc. 5-9, pp. 32-33). Mr. Minton indicated that his wife filled his "medicine planner containers" and reminded him to take his medications. (Doc. 5-9, p. 33). Mr. Minton said he prepared simple meals but not complicated ones because he could not stand for long periods. (Doc. 5-9, p. 33). Mr. Minton reported that he loaded the dishwasher, sometimes folded clothes, ironed one garment, but he needed to stop and rest and "sometimes need[ed] help remembering to finish the task." (Doc. 5-9, p. 33). Mr. Minton stated that he could not do yardwork, sweep, mop, or vacuum. (Doc. 5-9, p. 34).

Mr. Minton indicated that he went outside daily and drove. (Doc. 5-9, p. 34). Mr. Minton reported that he took his children to the gym and school five days a

week, went to church twice a week, grocery shopped once a week for about 15 minutes, and went to antique stores twice a week. (Doc. 5-9, pp. 34-35). Mr. Minton stated that he could pay bills, count change, and manage a checking and savings account. (Doc. 5-9, p. 34).

Mr. Minton reported that his hobbies were going to church, reading, and spending time with his family but that his medical conditions affected his ability to do those things. (Doc. 5-9, p. 35). He had coached soccer, led youth at church, and attended monthly social functions but could no longer do so. (Doc. 5-9, p. 36). Mr. Minton reported that his medical conditions affected his ability to lift, squat, stand, bend, reach, walk, kneel, talk, and climb stairs. (Doc. 5-9, p. 36). He indicated that he had problems with memory, concentration, ability to complete tasks, understand, follow instructions, and use his hands. (Doc. 5-9, p. 36). Mr. Minton stated that he could pay attention for fifteen minutes, follow written instructions if he constantly re-read the instructions, and needed reminders for spoken instructions. (Doc. 5-9, p. 36). Mr. Minton reported that stress made him "yell and lose [his] temper," that he did not like anyone he did not know or trust dictating anything to him, that he got "emotionally irritated" when stressed, and that he did not handle changes well because routine and reminders helped him accomplish daily tasks. (Doc. 5-9, p. 37).

### *Consultative Opinions*

#### *Dr. Samuel Fleming's Consultative Mental Examination*

On April 23, 2019, at the request of the Social Security Administration, clinical neuropsychologist Dr. Fleming examined Mr. Minton and reviewed background information that the Social Security Administration provided. (Doc. 5-10, pp. 3, 6). Mr. Minton indicated that he graduated from high school and completed 160 hours of college but did not obtain a degree. (Doc. 5-10, p. 4). Mr. Minton stated that he was sexually abused at age five or six. (Doc. 5-10, p. 3). Mr. Minton reported that he had experienced emotional problems since 2009, that he had difficulty getting out of bed when he worked, and that he had problems "motivating himself to get out of bed." (Doc. 5-10, p. 3). Mr. Minton reported that he got angry often; had lost interest in things he previously enjoyed; had an excessive sex drive; drank "excessively at times;" and struggled with insomnia, restlessness, poor energy, occasional crying spells, and "daily blue spells." (Doc. 5-10, pp. 3-4).

Dr. Fleming noted that Mr. Minton had adequate personal hygiene, was cooperative with a positive attitude, and was oriented to person, place, time, and situation. (Doc. 5-10, p. 4). Mr. Minton reported symptoms of depression; had "deficient" concentration and attention as he "could not perform serial-7s;" had "deficient" judgment and insight; had adequate abstraction, fund of information, and

immediate and delayed memory recall; had normal thought process and content; and had average intellectual abilities.  (Doc. 5-10, pp. 4-5).

Dr. Fleming's diagnoses included "Major Depression, Recurrent, Severe without Psychotic features; and Alcohol Abuse."  Dr. Fleming assigned Mr. Minton a GAF score of 70.  (Doc. 5-10, p. 6).  Dr. Fleming opined that Mr. Minton was "capable of understanding and carrying out instructions but not remembering them" and "would have some difficulty responding appropriately to supervision, coworkers, and work pressures in the work setting given his problems with anxiety." (Doc. 5-10, p. 6).  Dr. Fleming noted that Mr. Minton "could have a positive prognosis if he received adequate mental health assistance."  (Doc. 5-10, p. 6).

### Dr. Guendalina Ravello's Administrative Mental Assessment

On April 26, 2019, at the request of the Social Security Administration, psychologist Dr. Ravello reviewed Mr. Minton's medical records and assessed his mental residual capacity.  (Doc. 5-5, pp. 9-11, 17-19).  Dr. Ravello found that Mr. Minton was not limited in his ability to adapt and manage himself and to understand, remember, or apply information.  (Doc. 5-5, pp. 13, 17-18).  Dr. Ravello opined that Mr. Minton was not "significantly limited" in his ability to carry out simple and detailed instructions, perform within a schedule, maintain regular attendance, be punctual, sustain ordinary routine without supervision, make simple work-related decisions, complete a normal workday, perform at a consistent pace, and maintain

socially appropriate behavior.  (Doc. 5-5, pp. 17-18).  Dr. Ravello found that Mr. Minton had moderate limitations in his ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Doc. 5-5, pp. 17-18).

Dr. Ravello noted that Mr. Minton "should be able to concentrate and attend to simple tasks for [two] hours and [would] need all customary rests and breaks;" that he "would benefit from a flexible schedule;" would miss one to two days of work per month because of his mental condition; would benefit from "casual supervision;" and would "work best in a well-spaced environment with few familiar co-workers to minimize stress or distractions."  (Doc. 5-5, p. 18).  Dr. Ravello opined that Mr. Minton's contact with the public and co-workers should be casual, and feedback from supervisors should be "supportive, tactful, and non-confrontational to prevent unnecessary stress."  (Doc. 5-5, p. 18).

### First Administrative Hearing

The ALJ held Mr. Minton's first administrative hearing on February 4, 2020.  (Doc. 5-4, p. 26).  Mr. Minton's attorney attended the hearing, but Mr. Minton did not because he had the flu.  (Doc. 5-4, p. 26).  Mr. Minton's attorney presented medical records from American Family Care verifying Mr. Minton's flu diagnosis

on February 2, 2020, but the ALJ would not enter those records into evidence because Mr. Minton's attorney did not submit them five days before the hearing pursuant to SSR 17-4p.  (Doc. 5-4, pp. 27-30).  Mr. Minton's attorney asked that the ALJ postpone the hearing to "preserve the right to have [Mr. Minton] testify."  (Doc. 5-4, pp. 30-32).   The ALJ stated that Mr. Minton had "essentially testified in completing the application and all the forms."  (Doc. 5-4, p. 31).  Mr. Minton's attorney objected to continuing the hearing without Mr. Minton present.  (Doc. 5-4, pp. 31-32).  The ALJ stated that he was "under a burden to move" the hearing and that if Mr. Minton submitted "something in writing," the ALJ would consider moving the hearing.  (Doc. 5-4, p. 32).  The ALJ proceeded with the hearing and examined vocational expert David Head.  (Doc. 5-4, p. 32).

Regarding past work, Mr. Head classified Mr. Minton's job in the human resources office in the Army National Guard as a combined job as a human resources or personnel clerk, classified as semi-skilled, sedentary work, and as an administrative clerk, classified as semi-skilled, light work but performed as medium work.  (Doc. 5-4, pp. 33-34).  Mr. Head testified that the skills for the human resources or personnel clerk jobs could transfer to a job as an appointment clerk, classified as semi-skilled, sedentary work.  (Doc. 5-4, p. 34).  Mr. Head classified Mr. Minton's past work as a manager of a rehabilitation center as skilled, light work.  (Doc. 5-4, p. 34).

22

The ALJ asked Mr. Head to consider the work available to a younger individual with a high school education and work history as a personnel and administrative clerk who could perform light work with the following limitations: could not climb ladders, ropes, or scaffolds; could not work around hazards; occasionally could climb ramps or stairs, kneel, crouch, and crawl; frequently could balance or stoop; could concentrate and complete simple tasks for two-hour periods with customary breaks in an eight-hour workday in a 40-hour week; needed a well-spaced environment, at least three feet from co-workers; and should have no more than occasional interaction with supervisors, co-workers, or the public. (Doc. 5-4, pp. 35-36).

Mr. Head testified that an individual with those limitations could not work the combined personnel job or the appointment clerk job. (Doc. 5-4, p. 36). The individual could perform unskilled light or sedentary work as a sorter, with 93,000 available jobs nationally; as an assembler, with 115,000 available jobs nationally; and as a housekeeper, with 450,000 available jobs nationally. (Doc. 5-4, pp. 36-37).

Mr. Head testified that typically employers allowed three breaks in a workday after each two-hour work increment, including two 15-minute breaks and one 30-minute lunch break. (Doc. 5-4, p. 37). Mr. Head indicated that an employee should not be absent from work more than 20 times a year or two times a month for an extended period of several months. (Doc. 5-4, p. 37).

Mr. Minton's attorney asked Mr. Head to consider an individual who could understand and carry out instructions but could not remember them. (Doc. 5-4, p. 38). Mr. Head testified that it would depend on the difficulty of the job instructions to determine if the individual could work. (Doc. 5-4, p. 38). Mr. Head testified the above-mentioned jobs under the first hypothetical involved "numerous tasks" that an individual could not perform if he could not remember the tasks; the individual could perform those tasks if he "could understand and carry out the instructions." (Doc. 5-4, p. 39).

### *Second Administrative Hearing*

Mr. Minton's second administrative hearing took place on September 2, 2021 via video conference. (Doc. 5-4, p. 4). Mr. Minton and his attorney attended the hearing. (Doc. 5-4, p. 4). Mr. Minton testified that he worked for a boy's ranch with abused children in August 2018 and left that job because the environment "brought back . . . the stress that [he] went through as a young child." (Doc. 5-4, pp. 7-8). Mr. Minton stated that he struggled with depression, anger outbursts, and impulsivity. (Doc. 5-4, p. 8). Mr. Minton stated that since the summer of 2018, he had "bad days" three days a week. (Doc. 5-4, pp. 8-9, 14). On the bad days, Mr. Minton could not get out of bed; could not function because he was mentally, physically, and spiritually exhausted; hurt all over his body and felt like a freight train had run over him; felt worthless because he could not do anything for anyone

24

or himself; and felt like the world was "crushing in on" him.  (Doc. 5-4, pp. 8, 11, 13-14).  Mr. Minton testified that the psychiatrist at the VA had to adjust his mental health medications because they were not working.  (Doc. 5-4, pp. 10-11).  Mr. Minton indicated that he attended therapy sessions with Steve Johnson every month at the VA clinic in Gadsden.  (Doc. 5-4, pp. 6-7, 9).  Mr. Minton stated that in his last therapy session, he discussed "traumatic stuff," including that Mr. Minton was molested as a young child.  (Doc. 5-4, pp. 9-10).  According to Mr. Minton, Mr. Johnson told him that he deflected from questions about traumatic events.  (Doc. 5-4, p. 10).

Mr. Minton testified that he had memory issues that affected his ability to be timely and remember appointments; his wife and teenage son had to make sure Mr. Minton got where he needed to be.  (Doc. 5-4, pp. 8, 15).  Mr. Minton stated that he forgot where he was driving and had to pull over and call his wife.  (Doc. 5-4, p. 15).  Mr. Minton indicated that his wife put his medications into a "7-day planner" and reminded him to take his medications.  (Doc. 5-4, p. 15).  Mr. Minton stated that he was nervous and needed "some relief" and that he felt like a "total failure" not being able to work to support his family.  (Doc. 5-4, p. 15).  Mr. Minton testified that no doctor had recommended inpatient mental health treatment.  (Doc. 5-4, p. 16).

Vocational expert Daniel Lustig testified at the hearing.  (Doc. 5-4, p. 17).  Mr. Lustig classified Mr. Minton's past work as a teacher as skilled, light work

performed at the heavy exertional level and as a personnel manager as skilled, sedentary work performed at the heavy exertional level. (Doc. 5-4, p. 18). The ALJ asked Mr. Lustig to consider the work available to an individual with a high school education and work history as a teacher and personnel manager who could perform light work with the following limitations: could not climb ladders, ropes, or scaffolds; could not work around hazards; occasionally could climb ramps or stairs, kneel, crouch, and crawl; frequently could balance or stoop; could understand, remember, and carry out simple instructions; should have no more than 30 minutes of interaction with supervisors, co-workers, or the public at any one time; and could not be in close proximity to others. (Doc. 5-4, p. 19). Mr. Lustig testified that the individual could not perform Mr. Minton's past work as a teacher or personnel manager. (Doc. 5-4, p. 20).

The ALJ clarified the "close proximity" limitation and added to the hypothetical that the individual could not work on tandem tasks with others at the same time. (Doc. 5-4, p. 20). Mr. Lustig testified that the individual could perform unskilled, light work as an assembler, with 60,000 available jobs nationally; as a sewing machine operator, with 35,000 available jobs nationally; and as a can filling and closing machine tender, with 25,000 available jobs nationally. (Doc. 5-4, pp. 20-21).

Mr. Lustig testified employers typically tolerated up to ten percent off-task behavior and one absence a month.  (Doc. 5-4, p. 21).

## THE ALJ'S DECISION

On September 20, 2021, the ALJ issued an unfavorable decision.  (Doc. 5-3, pp. 119-44).  The ALJ found that Mr. Minton had not engaged in substantial gainful activity since his alleged onset date of August 24, 2018.  (Doc. 5-3, p. 125).  The ALJ determined that Mr. Minton suffered from the severe impairments of depression, anxiety, trauma, ischemic heart disease, coronary artery disease, myocardial infarction, hypertension, obesity, diabetes mellitus, and osteoarthritis. (Doc. 5-3, p. 125).  The ALJ also determined that Mr. Minton had the non-severe impairments of sleep apnea, hyperlipidemia, tinnitus, asthma, lumbosacral strain, rhinitis, plantar fasciitis, left knee meniscal tear, tenosynovitis, temporomandibular joint pain, and alcohol abuse.  (Doc. 5-3, p. 125).  Based on a review of the medical evidence, the ALJ concluded that Mr. Minton did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 5-3, p. 126).

Considering Mr. Minton's impairments, the ALJ evaluated Mr. Minton's residual functional capacity.  (Doc. 5-3, p. 128).  The ALJ determined that Mr. Minton had the RFC to perform:

> light work . . . except . . . [he was] unable [to] climb ladders, ropes, or scaffolds[] or to perform around hazards.  [He could] occasionally

climb ramps or stairs, kneel, crouch, or crawl[;] . . . [could] frequently balance or stoop[;] . . . [could] understand, remember, and carry out simple instructions[] but should have no job involving tandem tasks or work in close proximity to other workers.  Interaction with the public, co-workers, or supervisors should be no more than occasional, and brief (no more than thirty minutes at one time).

(Doc. 5-3, p. 128).

Based on this RFC and relying on testimony from Mr. Lustig, the ALJ concluded that Mr. Minton could not perform his past relevant work as a personnel manager. (Doc. 5-3, p. 136).[7]  Relying on testimony from Mr. Lustig, the ALJ found that other jobs existed in significant numbers in the national economy that Mr. Minton could perform, including assembler, sewing machine operator, and can filling and closing machine tender.  (Doc. 5-3, p. 137).  Accordingly, the ALJ determined that Mr. Minton was not disabled as defined by the Social Security Act. (Doc. 5-3, p. 138).

## APPEALS COUNCIL PROCEEDINGS

Mr. Minton asked the Appeals Council to review the ALJ's decision, and he submitted additional evidence to the Appeals Council.  (Doc. 5-3, p. 2).  Relevant here, Mr. Minton submitted to the Appeals Council the medical opinions of psychologist Dr. June Nichols, including a psychological evaluation dated

---

[7] The ALJ found that "based on a review of relevant earnings records," Mr. Minton's past relevant work did not include work as a teacher.  (Doc. 5-3, p. 136).

December 7, 2021, and a mental health source statement dated January 13, 2022. (Docs. 5-3, pp. 84-91).[8]

In her December 7, 2021 psychological evaluation of Mr. Minton, Dr. Nichols noted that Mr. Minton's attorney provided "extensive background medical and psychiatric records" for review. (Doc. 5-3, p. 84). Dr. Nichols summarized Mr. Minton's medical records. (Doc. 5-3, pp. 84-86). Mr. Minton reported that he was molested when he was six years old and provided details of the assault. (Doc. 5-3, p. 86). Mr. Minton stated that he was molested again at the age of nine. (Doc. 5-3, p. 86). Mr. Minton stated that he withdrew, did not feel safe with anyone, was a total recluse, and tried to be invisible at school. (Doc. 5-3, p. 86). Mr. Minton reported that in his teenage years, he was mean, sexually promiscuous, drank at age 12, "smoked dope," tried LSD twice, took pain pills, and tried to be the "life of the party" to "compensate" for what happened to him. (Doc. 5-3, p. 86).

Mr. Minton indicated that he joined the National Guard while in high school, attended Gadsden State, married at the age of 20, joined the Army, got divorced from his first wife, got out of the Army, rejoined the National Guard, and married his

_____

[8] Mr. Minton also submitted medical evidence from Carr Mental Wellness dated October 4 to November 8, 2011; Gadsden Regional Medical Center dated August 19 to August 20, 2017 and January 20 to January 22, 2022; a third-party statement from Wendy Minton dated January 31, 2022; Sparks Orthopedics and Sports Medicine from January 10 to May 5, 2022; and VA records dated April 4, 2022. (Doc. 5-3, p. 3). Mr. Minton challenges only the Appeals Council's treatment of Dr. Nichols's medical opinions. (*See* Doc. 7, p. 12).

second wife, had two children, and was deployed to Germany as a military police officer.  (Doc. 5-3, p. 86).  Mr. Minton stated that his second wife had an affair in 2009 with the person who had molested him and that he had "wanted to kill him, but part of [him] turned back into a nine-year old kid."  (Doc. 5-3, p. 86).  He indicated that he had three affairs, but he and his second wife worked through their issues. (Doc. 5-3, pp. 86-87).  Mr. Minton indicated that he "survived at work with hate, anger, and revenge," that he retired from the National Guard in 2016, and that he had triple bypass surgery in 2017.  (Doc. 5-3, pp. 86-87).

Mr. Minton stated that after his surgery, he went through a major depression that "broke" him.  (Doc. 5-3, p. 87).  He went to work for Eagle Rock Boys Ranch in 2018 and was the shop foreman for woodworking.  (Doc. 5-3, p. 87).  After a 12-year-old boy from the ranch who had been sexually abused by his mother's boyfriend was returned to his mother, Mr. Minton stopped working at the ranch.  (Doc. 5-3, p. 87).

Mr. Minton reported a depressed mood, loss of interest, trouble sleeping, hopelessness, agitation, excessive worry, crying spells, poor concentration, tension, feelings of panic, social withdrawal, anxiety in social settings, inability to complete tasks, difficulty organizing things, forgetfulness, confusion, disorientation, indecisiveness, feelings of emotional distance from others, racing thoughts, sexual problems, binge eating, and impulsiveness.  (Doc. 5-3, pp. 88-89).  Mr. Minton

indicated that he thought about hurting himself, sometimes wished he was dead, thought about hurting someone else, and had "recurrent distressing dreams." (Doc. 5-3, p. 89). He reported that he was never comfortable in a crowd, had panic attacks, avoided dealing with people because he did not deal well with people, and did not have "a lot of patience with people." (Doc. 5-3, pp. 88-89). Mr. Minton stated that his depression and anxiety caused him to have "bad days" two to three times a week and that on those days, he did not leave his bed. (Doc. 5-3, p. 88). On a "productive day," he took his kids to school and accomplished a household chore. (Doc. 5-3, p. 88).

Dr. Nichols noted that Mr. Minton was well-groomed and had good eye contact, clear speech, and a normal mood and affect. (Doc. 5-3, p. 87). Mr. Minton had good judgment and insight, clear stream of consciousness, adequate mental processing, adequate general fund of knowledge, grossly intact memory, and average intelligence. (Doc. 5-3, p. 88).

Dr. Nichols diagnosed Mr. Minton with post-traumatic stress disorder, bipolar II disorder, generalized anxiety, and panic disorder. (Doc. 5-3, p. 89). Dr. Nichols opined that Mr. Minton could carry out "very short and simple instructions;" could not maintain concentration or pace for at least two hours and be punctual within customary tolerances; could sustain an ordinary routine without special supervision; could not adjust to routine and infrequent work changes; could not interact with

supervisors and/or co-workers; and could not maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Doc. 5-3, p. 89).  Dr. Nichols stated that Mr. Minton would be off task for 20-30% of an eight-hour workday, and he would likely not show up for work ten to twelve days in a 30-day period.  (Doc. 5-3, p. 89).  Dr. Nichols noted that Mr. Minton's limitations dated to August 24, 2018.  (Doc. 5-3, p. 89).

On January 13, 2022, Dr. Nichols completed a one-page mental health source statement in which she included the same limitations for Mr. Minton.  (Doc. 5-3, p. 91).  Dr. Nichols indicated that the limitations dated to August 24, 2018.  (Doc. 5-3, p. 91).  Dr. Nichols did not state the basis for her January 2022 opinion.

The Appeals Council found no "basis for changing the [ALJ's] decision" and denied Mr. Minton's request for review.   (Doc. 5-3, p. 2).   Regarding the supplemental evidence from Dr. Nichols, the Appeals Council found that Dr. Nichols's December 7, 2021 opinion did "not relate to the period at issue" and did "not affect the decision about whether [Mr. Minton was] disabled beginning on or about March 31, 2022." (Doc. 5-3, p. 3).[9]  The Appeals Council did not include Dr.

---

[9]  The Court is confused by the Appeals Council's use of "March 31, 2022."  Mr. Minton alleged that his disability began August 24, 2018.  (Doc. 5-8, p. 5).  The ALJ entered his decision on September 20, 2021, Mr. Minton requested Appeals Council review on November 11, 2021, and the Appeals Council denied review on May 27, 2022.  (Doc. 5-3, pp. 1-3, 138).

Nichols's December 2021 opinion as an exhibit to its order and did not make the opinion part of the record.  (*See* Doc. 5-3, p. 7).

The Appeals Council found that Dr. Nichols's January 13, 2022 mental health source statement did not create a "reasonable probability that it would change the outcome of the [ALJ's] decision," so the Appeals Council "did not exhibit this evidence." (Doc. 5-3, pp. 3, 7).  The Appeals Council "found no reason under [its] rules to review the [ALJ's] decision."  (Doc. 5-3, p. 2).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [its] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the Commissioner. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th

33

Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the Commissioner's legal conclusions, a district court must determine whether the Commissioner applied the correct legal standards. The "decision of the Appeals Council not to consider the evidence and deny review is . . . subject to judicial review because it amounts to an error of law." *Ingram v. Comm'r Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007) (internal quotations and citations omitted). "[W]hen the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate." *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015).

## DISCUSSION

Mr. Minton argues that the Appeals Council erred when it determined that Dr. Nichols's December 2021 opinion regarding Mr. Minton's mental limitations was not chronologically relevant. (Doc. 7, p. 2). Mr. Minton also challenges the Appeals Council's determination that Dr. Nichols's January 2022 mental health source statement was not material. (Doc. 7, p. 2).

With a few exceptions, a claimant may present new evidence at each stage of the administrative process, "including before the Appeals Council." *Washington*, 806 F.3d at 1320 (quoting *Ingram*, 496 F.3d at 1261). The Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).[10] The Appeals Council does not have to provide a detailed explanation to support its denial of review. *Mitchell v. Comm'r Soc. Sec. Admin.*, 771 F.3d 780, 784 (11th Cir. 2014).

Evidence that "relates to the period on or before the date of the hearing decision" is chronologically relevant. *See* 20 C.F.R. § 404.970(a)(5); *Banks v. Comm'r Soc. Sec. Admin.*, 686 Fed. Appx. 706, 709 (11th Cir. 2017). Evidence is

---

[10] The new regulations governing additional evidence submitted to the Appeals Council became effective January 17, 2017. *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90897 (Dec. 16, 2016); 20 C.F.R. 404.970(a)(5) (2017). Because Mr. Minton filed his disability application in 2018, the new regulations apply.

Under the pre-2017 regulations, the Appeals Council, in deciding whether to grant review, had to "consider" whether the new evidence made the ALJ's decision contrary to the weight of the evidence. 20 C.F.R. § 404.970(b) (2016). The new regulation governing additional evidence submitted to the Appeals Council does not contain this provision. 20 C.F.R. § 404.970 (2017). The new regulation "provides more clarity to this procedure. . . . [T]he Appeals Council will grant review of a case based on the receipt of additional evidence if the evidence is new, material, and related to the period on or before the date of the hearing decision and if there is a reasonable probability that the additional evidence would change the outcome of the decision." *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. at 90991.

chronologically relevant if it is based upon "experiences that had occurred before the ALJ's decision and on a review of medical records from the period before the ALJ's decision." *Ring v. Comm'r Soc. Sec. Admin.*, 728 Fed. Appx. 966, 968 (11th Cir. 2018) (citing *Washington*, 806 F.3d at 1321); *see also Hargress v. Comm'r Soc. Sec. Admin.*, 883 F.3d 1302, 1309 (11th Cir. 2018) (stating that evidence that post-dates the ALJ's decision may be chronologically relevant when the doctor considers past medical records from the relevant time period, the claimant describes the "mental symptoms during the relevant period" to the doctor, and there is "no evidence of the claimant's mental decline since the ALJ's decision").

Additional evidence submitted to the Appeals Council is material if there is a "reasonable probability that it would have changed the outcome of the decision." *Smith*, 2023 WL 6938521 at *9; *see Spurgeon*, 2024 WL 1395258, at *6 ("New evidence is material when, if accepted, a reasonable possibility exists that it would change the administrative result.") (citing *Washington*, 806 F.3d at 1321) (internal quotations omitted).[11]   "Where evidence submitted to the Appeals Council contradicts other records that the ALJ found more credible, the new evidence is not material. . . ." *Smith*, 2023 WL 6938521, at * 9 (citing *Hargress*, 883 F.3d at 1310). The Appeals Council may deny review when additional evidence is merely

---

[11] Evidence is material if it "is relevant, i.e., involves or is directly related to issues adjudicated by the ALJ." SOC. SEC. ADMIN., HALLEX Ch. I-3-3.6.B.2 (last visited Sept. 25, 2024).

cumulative of evidence that is already in the record. *Mitchell v. Comm'r Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014).

Mr. Minton argues that the Appeals Council erred when it found that Dr. Nichols's December 2021 opinion did not relate to the period at issue. The Court agrees. Dr. Nichols reviewed Mr. Minton's medical records from a relevant period before the ALJ's decision. In her opinion, Dr. Nichols discussed Mr. Minton's medical history concerning his physical and mental impairments from 2014 to 2021. (Doc. 5-3, pp. 84-87). Dr. Nichols indicated that Mr. Minton's mental limitations "existed back to 8/24/18." (Doc. 5-3, p. 89). Because Dr. Nichols reviewed and discussed Mr. Minton's medical records from the relevant time period, Dr. Nichols based her opinion on Mr. Minton's medical condition that existed before the ALJ's decision. S*ee Ring*, 728 Fed. Appx. at 968 (citing *Washington*, 806 F.3d at 1321).

Moreover, Mr. Minton discussed with Dr. Nichols his mental symptoms during the relevant time period. *See Hargress*, 883 F.3d at 1309 (citing *Washington*, 806 F.3d at 1319, 1322-23 for the proposition that evidence that post-dates the ALJ's decision may be chronologically relevant when the claimant describes to the doctor the "mental symptoms during the relevant period"). Mr. Minton discussed with Dr. Nichols events from his childhood, his marriages, his military service, and his job in 2018 at a boy's ranch. (Doc. 5-3, pp. 86-87). In describing his mental symptoms to Dr. Nichols, Mr. Minton reported symptoms that he experienced six months before

Dr. Nichols's December 2021 evaluation and indicated that he had "been fighting" severe depression and anxiety since 2017.  (Doc. 5-2, pp. 88-89).  Because Dr. Nichols's December 2021 opinion relates to the relevant period before the ALJ's decision, the Appeals Council erred in finding that Dr. Nichols's December 2021 opinion was not chronologically relevant.[12]

Here, the Appeals Council's error does not warrant reversal because Dr. Nichols's December 2021 opinion was not material; no reasonable probability exists that the evidence would have changed the outcome of the ALJ's decision.  Dr. Nichols opined, among other things, that Mr. Minton could not maintain concentration or pace for at least two hours and be punctual within customary tolerances, could not adjust to routine and infrequent work changes, could not interact with supervisors and/or co-workers, and could not maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Doc. 5-3, p. 89).  These limitations would render Mr. Minton unable to work, but internal inconsistencies in Dr. Nichols's December 2021 opinion and inconsistencies between her opinion and other medical evidence defeat Mr. Minton's contention that

---

[12]  Mr. Minton reported to Dr. Nichols several symptoms, including suicidal thoughts and panic attacks, that he had not reported to his doctors or therapist.  These additional symptoms could suggest that Mr. Minton's mental symptoms had deteriorated but not to an extent to find that Dr. Nichols's December 2021 opinion did not relate to the relevant period.  Mr. Minton's reported symptoms to Dr. Nichols in December 2021 that were "reasonably related" to his PTSD, depression, and anxiety symptoms reported during the "time period adjudicated in the hearing decision."  *See* SOC. SEC. ADMIN., HALLEX Ch. I-3-3.6.B.2 (last visited Sept. 25, 2024).

a reasonable probability exists that Dr. Nichols's opinion would have changed the ALJ's decision. *See Goble v. Comm'r of Soc. Sec. Admin.*, 1:21-cv-00149-CLS, 2023 WL 2823401, at * 9 (11th Cir. April 7, 2023) (unpublished) (finding that new evidence was not material where inconsistencies in the doctor's opinion called into question the supportability and consistency of the opinion such that the opinion did not have reasonable probability of changing the ALJ's decision).[13]

Dr. Nichols noted that Mr. Minton was "neat and clean" during the evaluation, but Dr. Nichols opined that Mr. Minton could not "adhere to basic standard of neatness and cleanliness." (Doc. 5-3, pp. 87, 89). Dr. Nichols did not explain this inconsistency. The record shows that Mr. Minton was neat and clean at medical visits. (Doc. 5-11, pp, 200, 218; Doc. 5-14, p. 92; Doc. 5-15, p. 34). Dr. Fleming noted that Mr. Minton had adequate personal hygiene. (Doc. 5-10, p. 4). The ALJ would recognize these inconsistencies.

Mr. Minton described to Dr. Nichols two panic episodes possibly attributable to his asthma, and Dr. Nichols diagnosed Mr. Minton with a panic disorder. (Doc. 5-3, pp, 88, 89). The Court could not find in the record previous reports of panic attacks, and no doctor had diagnosed a panic disorder. Mr. Minton denied panic

---

[13] Mr. Minton argues that he "need not show" that the ALJ would have found Dr. Nichols's opinions "persuasive under 20 C.F.R. § 404.1520c, only that [the opinions were] relevant, probative, and that there [was] a reasonable possibility/probability that [the opinions] would change the outcome." (Doc. 12, p. 9). Whether Dr. Nichols's opinion was consistent with the medical evidence in the record and was internally consistent are relevant to whether a reasonable probability exists that the ALJ would change his decision based on that opinion.

attacks at a visit in 2019.  (Doc. 5-11, p. 216).  The ALJ likely would have found that Dr. Nichols's diagnosis of panic disorder and disabling mental limitations were inconsistent with the evidence in Mr. Minton's medical record.

Mr. Minton's medical evidence and reports from Mr. Minton on which Dr. Nichols based her opinion regarding off-task behavior and absenteeism mirrored record evidence the ALJ considered in determining Mr. Minton's RFC.  The ALJ recounted the evidence in Mr. Minton's medical record regarding his mental limitations, including Mr. Minton's testimony and reports regarding his two to three "down" days a week on which he claimed he could not function.  (Doc. 5-3, pp. 132-34).  To support his findings that Mr. Minton had at most moderate mental limitations, the ALJ cited mental status examinations in the record that routinely showed that Mr. Minton was cooperative, pleasant, and well-groomed and had normal thoughts, speech, insight, judgment, memory, concentration, and cognition despite having a depressed mood and anxiety.  (Doc. 5-3, pp. 132-33; *see* Doc. 5-4, p. 65; Doc. 5-10, pp. 14, 17, 19-20, 24, 26-27, 29-30, 159-60, 185; Doc. 5-11, pp. 14, 200, 216, 218; Doc. 5-12, pp. 58, 69; Doc. 5-14, pp. 52, 99; Doc. 5-15, pp. 21, 68).  Dr. Nichols's mental status examination of Mr. Minton was normal; Mr. Minton had good eye contact, clear speech, normal mood and affect, good judgment and insight, clear stream of consciousness, adequate mental processing, adequate general fund of knowledge, grossly intact memory, and average intelligence.  (Doc.

5-3, pp. 87-88); *see Averson v. O'Malley*, 4:23-cv-00533-LSC, 2024 WL 1815350, at * 7 (N.D. Ala. April 25, 2024) (finding new evidence presented to the Appeals Council was not material where the plaintiff "regularly received normal mental examination findings," and the new evidence contained normal mental examination findings). There is no reasonable probability that the ALJ's decision would have changed based on Dr. Nichols's normal mental status findings.

Dr. Nichols's opinion contradicted the opinions of Dr. Ravello and Dr. Fleming that Mr. Minton had moderate limitations in mental functioning. (Doc. 5-5, pp. 17-18; Doc. 5-10, pp. 3-6); *see Spurgeon*, 2024 WL 1395258, at *7 (finding that Dr. Nichols's opinion that Spurgeon would miss 15 or more days a month from work was not material because Dr. Nichols did not explain her basis for the opinion, and the opinion contradicted other evidence in the record). The ALJ found Dr. Ravello's and Dr. Fleming's opinions mostly persuasive and incorporated many of their mental limitations in Mr. Minton's RFC. (Doc. 5-3, pp. 128, 135). The ALJ accounted for Dr. Fleming's opinion that Mr. Minton could understand and carry out instructions but could not remember them by limiting Mr. Minton to simple instructions. (Doc. 5-3, p. 128). The ALJ found that Dr. Fleming's assessment that Mr. Minton would have "some difficulty" responding appropriately in the work setting was "not specific," but the ALJ included in Mr. Minton's RFC very limited interaction with his supervisor and co-workers to account for this difficulty. (Doc.

5-3, pp. 128, 135). Although the ALJ noted that neither Dr. Ravello nor Dr. Fleming had the complete record before them when they made their decision, nothing in Dr. Nichol's opinion suggests that the ALJ would credit Dr. Nichols's opinion over the opinions of Dr. Ravello and Dr. Fleming. (Doc. 5-3, p. 135). Given the inconsistencies in Dr. Nichols's December 2021 opinion, it is likely that the ALJ would credit Dr. Ravello's and Dr. Fleming's opinions over Dr. Nichols's more limiting opinion. *See Smith*, 2023 WL 6938521, at * 9 (citing *Hargress*, 883 F.3d at 1310) (finding that the new evidence was not material where it was inconsistent with Smith's medical records and the consultative opinions).

To support Mr. Minton's RFC, the ALJ noted that Mr. Minton could understand and respond adequately to the ALJ's question at the hearing regarding work history, impairments, symptoms, and treatment. (Doc. 5-3, p. 127). The ALJ found that Mr. Minton's ability to handle finances, drive, shop, attend church, and run various errands supported that Mr. Minton had no more than moderate mental limitations. (Doc. 5-3, pp. 127-28). The ALJ noted that no doctor had recommended inpatient mental health treatment. (Doc. 5-3, p. 133).

Dr. Nichols's December 2021 opinion, when considered with the record as a whole, does not create a reasonable probability that the ALJ would have changed his decision. Accordingly, Dr. Nichols's December 2021 opinion that Mr. Minton

submitted to the Appeals council does not "render[] the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262.

The same is true of Dr. Nichols's January 2022 mental health source statement. Dr. Nichols's January 2022 opinion contains the same mental limitations for Mr. Minton as her December 2021 opinion. (Doc. 5-3, pp. 89, 91). For the reasons stated above, Dr. Nichols's January 2022 mental health source statement is not material. Moreover, Dr. Nichols's January 2022 opinion is not chronologically relevant. Dr. Nichols indicated on the mental health source statement that Mr. Minton's limitations dated to August 24, 2018. (Doc. 5-3, pp. 84-86, 88). In her January 2022 opinion, Dr. Nichols did not indicate whether she evaluated Mr. Minton's "past medical records when forming that opinion." *See Hargress*, 883 F.3d at 1310 (finding new evidence was not material when the doctor indicated that the limitations dated back to the relevant period, but the doctor did not indicate on the form that he evaluated Hargress's past medical records when forming the opinion). Accordingly, the January 2022 mental health source statement was not material or chronologically relevant.[14]

---

[14] Mr. Minton argues that the Court should read Dr. Nichols's December 2021 and January 2022 opinions together. Doing so might cure the chronological factor with respect to the January 2022 opinion, but it would not make that opinion material.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** and **ORDERED** this September 27, 2024.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE